JAMES E. SELL, ESQ. (SBN 135935)
LYNCH, GILARDI & GRUMMER
A Professional Corporation
475 Sansome Street, Suite 1800
San Francisco, CA 94111
Telephone:    (415) 397-2800
Facsimile:    (415) 397-0937

Attorneys for Plaintiff
LANDING WAY DEPOT, INC

MARILYN RAIA (SBN 72320)
BULLIVANT HOUSER BAILEY
601 California Street, Suite 1800
San Francisco, CA 94108
Telephone:    (415) 352-2700
Facsimile:    (415) 352-2701

*E-filing*

Attorneys for Plaintiff
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LANDING WAY DEPOT, INC.,
ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

        Plaintiff(s),

    vs.

ON SITE MARINE LLC; DE JONG &
LEBET, INC.,

        Defendant(s).

Case No. CV 08 1537

DIVERSITY COMPLAINT FOR:
1. Breach of Contract
2. Negligence
3. Breach of Express Warranty
4. Breach of Implied Warranty of
   Merchantability

    COMES NOW LANDING WAY DEPOT, INC. and ST. PAUL FIRE AND MARINE

INSURANCE COMPANY, allege as follows:

**PARTIES**

    1.    Plaintiff LANDING WAY DEPOT, INC., is a California corporation with its

principal place of business in Petaluma, California. LANDING WAY DEPOT, INC.

(hereinafter referred to as "LANDING WAY") is the owner of the hopper barge *Eva Joan*,

Lynch, Gilardi
& Grummer
A Professional
Corporation
475 Sansome Street
Suite 1800
San Francisco, CA
94111
Ph (415) 397-2800
Fax (415) 397-0937

1  which is the subject of this litigation, and the assignee of Corto Meno Sand & Gravel, LLC

2  (hereinafter referred to as "Corto Meno"), which commissioned the construction of the *Eva*

3  *Joan*.

4      2.     ST. PAUL FIRE AND MARINE INSURANCE COMPANY is a Minnesota

5  corporation with principal places of business in Hartford, Connecticut, and St. Paul,

6  Minnesota. ST. PAUL FIRE AND MARINE INSURANCE COMPANY (hereinafter

7  referred to as "ST. PAUL") insured the hull of the *Eva Joan*.

8      3.     Plaintiffs are informed and believe and thereon allege that defendant ON SITE

9  MARINE, L.L.C., is a limited liability Missouri company, with its principal place of

10  business in Ash Grove, Missouri. ON SITE MARINE, L.L.C. (hereinafter "ON SITE")

11  was commissioned to design and build six barges, including the *Eva Joan*.

12      4.     Plaintiffs are informed and believe and thereon allege that defendant DE

13  JONG AND LEBET, INC., is a Florida corporation with its principal place of business in

14  Jacksonville, Florida. DE JONG AND LEBET, INC. (hereinafter referred to as "DE

15  JONG") is a naval architecture company which designed the *Eva Joan*.

16      5.     Plaintiffs are informed and believe and thereon allege that at all times

17  mentioned herein, defendants, and each of them, were the agents, servants, or employees of

18  each other, and that each of them was acting within the purpose and scope of its capacity as

19  an agent, servant, or employee, such that the actions of each defendant were and are

20  attributed to all other defendants.

## JURISDICTION

22      6.     Plaintiffs incorporate by reference the allegations contained in the preceding

23  paragraphs above as through fully set forth herein.

24      7.     Jurisdiction is proper in the United States District Court under 28 U.S.C.

25  1332, because the parties are all residents of different states, and the amount in

26  controversy exceeds $75,000.

## VENUE

28      8.     Plaintiffs incorporate by reference the allegations contained in the preceding

DIVERSITY COMPLAINT

1    paragraphs above as through fully set forth herein.

2        9.    Venue is proper in the Northern District of California pursuant to 28 U.S.C.

3    1391, because a substantial part of the events or omissions giving rise to the claims

4    alleged herein occurred in Petaluma, California, which is within the Northern District of

5    California, and a substantial part of the property that is the subject of these claims is

6    situated within Petaluma, California.

7                **GENERAL ALLEGATIONS**

8                **(The Design-Build Contract)**

9        10.    Plaintiffs incorporate by reference the allegations contained in the preceding

10    paragraphs above as through fully set forth herein.

11        11.    On or about April 15, 2005, ON SITE MARINE entered into a written

12    agreement with Corto Meno to design and construct six steel-hulled hopper barges.  The

13    barges were intended for the purpose of transporting sand and gravel within the Petaluma

14    River and the San Francisco Bay.  A true and correct copy of the agreement is attached

15    hereto as **Exhibit A.**

16        12.    The contract, entitled "Contract for the Design and Construction of Six

17    Barges" (and referred to hereinafter as the "Design-Build Agreement"), provided for a

18    staggered construction schedule, with construction of the first barge beginning on or about

19    May 1, 2005 but no later than June 1, 2005, and with construction of the remaining five

20    barges beginning every two months thereafter.  Construction time per barge was estimated

21    at four months, and all work under the contract was to be completed within fifteen months

22    of the start of work.  The contract called for a total contract price of $5,292,000.00.

23        13.    The Design-Build Agreement also contained the following relevant terms:

24            (a)    That ON SITE had "significant experience and expertise in the

25        design and construction of ships and barges," as stated at the outset of the agreement

26        (see the third paragraph of the opening recitations, page 1) ;

27            (b)    That ON SITE would be responsible for the development of the

28        design documents necessary for construction, and that the design documents would

1  be prepared by qualified architects, engineers and other design professionals (see

2  Par. 1.1.1);

3      (c)    That ON SITE would be responsible for acts and omissions of its

4  employees, subcontractors, and agents, including the design professionals

5  responsible for development of the design documents (see Par. 1.1.2);

6      (d)    That ON SITE's responsibilities included launching and testing of

7  the vessels (see Par. 2.11);

8      (e)    That ON SITE would maintain Commercial General Liability

9  insurance with a minimum limit of $1,000,000, and Umbrella/Excess Liability

10  Insurance with a minimum limit of $5,000,000 (see Par. 12.1, including page 1 of

11  Attachment A referenced therein);

12      (f)    That ON SITE's  insurance would be primary, and not contributory,

13  to any insurance maintained by Corto Meno and its assigns, and that Corto Meno

14  "and any other corporation, partnership, proprietorship or joint venture" in which

15  Corto Meno has a majority interest, or the shareholders of Corto Meno have a

16  majority interest, be Additional Insureds under the Commercial General Liability

17  and Umbrella/Excess Liability policies (see Par. 12.1, including page 2 of

18  Attachment A referenced therein);

19      (g)    That the description of operations section of the Certificates of

20  Insurance shall reflect "All operations, projects or activities conducted by the

21  Insured on behalf of the Additional Insureds (see Par. 12.1, including page 2 of

22  Attachment A referenced therein);"

23      (h)    That ON SITE defend and indemnify Corto Meno and its assigns

24  from any and all claims, damages, losses, liabilities, attorneys fees, costs and

25  expenses of whatsoever kind or nature, arising out of or in any way connected with

26  ON SITE's operations under the contract, including but not limited to damage to

27  property of anyone, including loss of use, caused or alleged to be caused in whole or

28  in party by any act or omission of ON SITE or anyone for whose acts ON SITE may

1    be liable, and that such indemnity obligations extend beyond the time of the contract

2    (see Par. 12.4);

3         (i)    That ON SITE expressly warranted that work which was not of such

4    good quality may be considered defective (see Par. 14.1);

5         (j)    That ON SITE warranted the work performed under the contract,

6    including that of subcontractors it retained, for a period of ten years from the date of

7    completion of the sixth and final vessel (see Par. 14.1); and

8         (k)    That the contract would be governed by the laws of the State of

9    California (see Par. 17.1).

10    14.    Plaintiffs are informed and believe and thereon allege that ON SITE retained

11    the services of naval architect defendant DE JONG to design the hopper barges. DE

12    JONG actually knew or should have known that the barges that it was to design had to

13    have the strength and capacity to haul 4000 tons of aggregate.

14    15.    On or about June 1, 2005, Corto Meno, with the knowledge and approval of

15    ON SITE, assigned its interest in the Design-Build Contract to plaintiff LANDING WAY.

16    A true and correct copy of the assignment is attached hereto as **Exhibit B**. The parties

17    memorialized ON SITE's consent to the assignment on September 29, 2006, a copy of

18    which acknowledgement is attached hereto as **Exhibit C**.

19    16.    The first and only barge completed by ON SITE was the *Eva Joan*. The

20    *Eva Joan* was completed on or about June 1, 2006, approximately eight months after the

21    time designated for completion.

22                         **(Insurance)**

23    17.    Plaintiffs incorporate by reference the allegations contained in the preceding

24    paragraphs above as through fully set forth herein.

25    18.    On May 31, 2006, ST. PAUL issued Ocean Marine Hull and Machinery

26    Policy No. 0H08400378, effective May 31, 2006 to July 1, 2007. LANDING WAY was a

27    named insured under the policy and the owner of the *Eva Joan*.

28

1        **(The Sinking of the *Eva Joan*)**

2        19.     The *Eva Joan* was launched in Petaluma, California on June 1, 2006, at

3    which time it was towed to Bay Ship and Yacht, in Alameda, California, for sand blasting

4    and painting.  Plaintiffs are further informed and believe that the *Eva Joan* was moved on

5    or about June 16, 2006, from Alameda, California, to Pier 54 in San Francisco, California,

6    where it remained until July 4, 2006.  There was no damage to the *Eva Joan* during this

7    time, and the barge did not sustain any damage, structural changes, or modifications

8    during its blasting, painting, and transportation.  Furthermore, between June 1, 2006 and

9    July 4, 2006, there were no structural changes or modifications made to the *Eva Joan*.

10        20.     At approximately 2:30 p.m., on July 4, 2006, in clear weather, the *Eva Joan*

11    was moved by tug to San Francisco's Anchorage 9 where the cargo ship *CSL Acadian*

12    loaded 2,500 tons of dry sand into the *Eva Joan's* hopper.  This amount of cargo was

13    approximately 62.5% of the warranted cargo capacity limit of 4000 short tons.  Loading

14    operations completed at 4:59 p.m.  At 5:05 p.m. the tug Master heard a loud sound

15    described as a "boom," at which time the *Eva Joan* buckled in the middle and began to

16    sink.  As the mid-section dropped, the bow and stern rose such that the barge filled with

17    water until, at or about 5:14 p.m., the mid-section came to rest on the floor of the San

18    Francisco Bay in 56 feet of water, with the bow and stern rising up out of the water and

19    into the air.

20        21.     The *Eva Joan* sank on the first day it was ever loaded with any cargo, even

21    though it was loaded with a cargo weight far lower than the capacity contracted for and

22    warranted by ON SITE.

23        22.     Plaintiffs are informed and believe that crew of the tug which had towed the

24    *Eva Joan* immediately contacted the San Francisco Vessel Traffic System and the U.S.

25    Coast Guard to notify them of the incident.  At 6:55 p.m. that same day, the Coast Guard

26    ordered that the *Eva Joan* not be moved until a Coast Guard-approved salvage plan was

27    developed.  After such a plan was approved LANDING WAY hired Bay Ship & Yacht to

28    salvage the *Eva Joan* and eventually move it to Alameda, California, where the barge

1  underwent repair and refurbishment.  Salvage and refurbishment costs paid by LANDING

2  WAY were approximately $1,868,555.

3  **(The Insurance Claim)**

4      23.  LANDING WAY filed claims with ST. PAUL for the losses sustained in

5  connection with the sinking of the *Eva Joan*.  ST. PAUL investigated the claims, and paid

6  LANDING WAY $1,327,500 in settlement of the claims.  ST. PAUL is subrogated to all

7  rights of LANDING WAY to the extent of the payments made to it.

8      24.  LANDING WAY continues to have losses of approximately $1,545,700.

9  **(The Marine Surveys)**

10      25.  Marine surveys were performed on behalf of ST. PAUL and LANDING

11  WAY prior to and during the course of the salvage operation.

12      26.  The surveys concluded that the design of the *Eva Joan* was defective

13  because it could not, as designed and built, carry the cargo weight which the construction

14  blueprints indicate was intended and warranted; 4000 short tons.

15  **FIRST CAUSE OF ACTION**

16  **(Breach of Contract - as to defendant ON SITE MARINE LLC)**

17      27.  Plaintiffs incorporate by reference the allegations contained in the preceding

18  paragraphs above as through fully set forth herein.

19      28.  ON SITE has been paid approximately $1,848,650 to date for design and

20  construction of the *Eva Joan* and other barges.

21      29.  LANDING WAY has fully performed all of its obligations under the

22  Design-Build Contract, and has not breached any of the terms or conditions of that

23  contract.

24      30.  ON SITE has breached the Design-Build Contract in numerous ways

25  including but not limited to: failing to design and construct a seaworthy vessel; failing to

26  design and construct a vessel which can carry its intended cargo; failing to perform the

27  design and build services in a workmanlike manner; failing to construct and complete five

28  of the six barges called for in the agreement; failing to obtain and maintain insurance

1   policies under which LANDING WAY was named insureds with primary coverage; and

2   failing to indemnify the LANDING WAY for the costs, expenses, losses, and attorneys

3   fees incurred as a result of the sinking of the *Eva Joan*.

4       31.    ON SITE's abandonment of the Design-Build Contract was wrongful,

5   unjustified, unexcused, and injurious to LANDING WAY.

6       32.    ON SITE's breach of the Design-Build Contract was wrongful, unjustified,

7   unexcused, and injurious to plaintiffs.

8       33.    As a result of ON SITE's breaches of the Design-Build Contract plaintiffs

9   have incurred damages as follows:

10       (a)    Approximately $2,800,000 in expenses associated with the salvage, clean

11   up, and refurbishment of the *Eva Joan*;

12       (b)    Approximately $2,400,000 to re-design, re-construct, and complete the

13   construction of the second barge that ON SITE started to build, but failed to complete;

14       (c)    Approximately $900,000 for the purchase and refurbishment of the barge,

15   *Lucca,* which was acquired by LANDING WAY in order for it to meet certain contractual

16   obligations with other third parties which it could not meet because of the breach of

17   contract by defendants;

18       (d)    LANDING WAY is informed and believes and thereon alleges that it will

19   incur approximately $9,000,000 in additional costs to complete the construction of the

20   remaining three barges.

21       Finally, plaintiffs have incurred, and continue to incur, costs associated with the

22   retention of counsel to enforce their rights and to protect their interests.

23       WHEREFORE, plaintiffs pray for judgment as hereinafter set forth.

24       **SECOND CAUSE OF ACTION**

25       **(Negligence – as to All Defendants)**

26       34.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1

27   through 27, above, as through fully set forth herein.

28       35.    Defendants owed LANDING WAY a duty to design and construct six

1   hopper barges for the purpose of transporting sand and gravel materials in and around the

2   San Francisco Bay.  More specifically, Defendants owed LANDING WAY a duty to

3   design and construct six hopper barges with a cargo capacity of 4000 short tons, as

4   evidenced by the specification regarding the same on the blueprints created by defendant

5   DE JONG.  Defendants represented themselves to be competent, knowledgeable, and

6   experienced in the areas of naval architecture and construction, and knew and intended

7   that LANDING WAY would rely on those representations.

8        36.    Defendants breached their obligations to LANDING WAY in failing to

9   design and build seaworthy vessels capable of carrying their intended cargo.  Defendants

10  further breached their obligations to LANDING WAY in failing to perform their services

11  within the standard of care required of such architects and builders.

12       37.    Defendants' negligent conduct has injured plaintiffs.  As a proximate cause

13  of defendants' breach of the standard of care in designing and constructing the barges

14  plaintiffs have sustained monetary damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**(Breach of Express Warranty – as to ON SITE MARINE, LLC)**

17       38.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1

18  through 27, above, above as through fully set forth herein.

19       39.    In exchange for valuable consideration, and in an essential term of the

20  Design-Build Contract, ON SITE expressly warranted that the work it performed would

21  be "of good quality, free from faults and defects and in conformance with the Contract

22  Documents." ON SITE further expressly warranted that work which was not of such good

23  quality may be considered defective.  In addition, ON SITE warranted that it would

24  correct or conform defective work for a period of ten years.

25       40.    The work performed by ON SITE was not of good quality, was not free from

26  faults and defects, and did not conform to the Contract Documents.  In addition, ON SITE

27  failed to conform the vessel to the warranty when it was notified by LANDING WAY of

28  the sinking incident.

41.    The ten-year warranty period has not expired, and ON SITE is obligated to uphold its warranty obligations.  To date ON SITE has failed to do so.

42.    As a proximate cause of ON SITE's breach of warranty plaintiffs have sustained and will sustain damages in connection with the salvage and refurbishment of the barge, as well as with the construction of the five additional barges required under the contract, and the retention of counsel to protect and enforce plaintiffs' rights under the warranty.

43.    WHEREFORE plaintiffs pray for judgment as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### (Breach of Implied Warranty of Merchantability – as to DE JONG AND LEBET, INC.)

44.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 27, above, as through fully set forth herein.

45.    Plaintiffs are informed and believe and thereon allege that DE JONG had notice, whether actual or constructive, that the hopper barges called for in the Design-Build Contract were intended for LANDING WAY, and anticipated that LANDING WAY would be the users of the barges.  Plaintiffs are further informed and believe and thereon allege that DE JONG intended that the barges be designed and constructed so as to carry 4,500 short tons of sand and gravel material in and around the San Francisco Bay. DE JONG knew or had reason to know that ON SITE represented to LANDING WAY that the design would be of good quality, free from faults and defects and in conformance with the Design-Build Contract, and that work which was not of such good quality may be considered defective.

46.    The design created by DE JONG was not fit for its intended purpose, and DE JONG breached its warranty of merchantability to LANDING WAY.

47.    As a proximate cause of ON SITE's breach of warranty, plaintiffs sustained and will sustain damages in connection with the salvage and refurbishment of the barge, as well as with the construction of the five additional barges required under the contract,

1 | and the retention of counsel to protect and enforce plaintiffs' rights under the warranty.

2 |       48.    WHEREFORE plaintiffs pray for judgment as hereinafter set forth.

3 | **PRAYER**

4 | WHEREFORE plaintiffs pray for judgment as follows:

5 |     1.    For compensatory damages in an amount according to proof;

6 |     2.    For costs of suit herein incurred;

7 |     3.    For attorneys' fees; and

8 |     4.    For all such other relief as this Court may deem necessary and proper.

9 |     5.

10 | DATED:    March 18, 2008

11 |

12 | LYNCH, GILARDI & GRUMMER
A Professional Corporation

13 |

14 | By _____
James E. Sell, Esq.

15 | Amelia D. Yaros, Esq.
Attorneys for Landing Way Depot, Inc.

16 | DATED:    March 18, 2008

17 | BULLIVANT HOUSER BAILEY

18 |

19 | By _____

20 | Marilyn Raia, Esq.
Attorneys for ST. PAUL FIRE AND MARINE
INSURANCE COMPANY

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1

## JURY DEMAND

2    Plaintiff LANDING WAY DEPOT, INC. requests a jury trial on all issues.

3

DATED:       March 19, 2008

4

5                                    LYNCH, GILARDI & GRUMMER
                                     A Professional Corporation
6

By _____
7
                                     James E. Sell, Esq.
8                                    Attorneys for Landing Way Depot, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
Lynch, Gilardi
& Grummer
5 Sansome Street      27
Suite 1800
in Francisco, CA
94111
t (415) 397-2800      28
x (415) 397-0937          \\SFDATA\CONVERSION\0738-0047\P\173872.DOC

                              DIVERSITY COMPLAINT

**EXHIBIT A**

### CONTRACT FOR THE DESIGN AND CONSTRUCTION OF SIX BARGES

THIS Contract is made on the _15th_ day of _April_ 2005 between Corto Meno Sand & Gravel, LLC (hereinafter "Owner") and On Site Marine Shipyards, LLC., 6329 Hwy. O, Ash Grove, MO 65604 (hereinafter "On Site").

WHEREAS, Owner would like to construct and operate (6) Steel Hull Hopper Boat/Barges (hereinafter the "Vessels"); and,

WHEREAS, On Site has significant experience and expertise in the design and construction of ships and barges similar to the Vessels; and,

WHEREAS, Owner is hiring On Site to design and provide the necessary labor and materials for the construction of the 6 Vessels at 400 Hopper Street in Petaluma, California (hereinafter, "the Work"); and,

NOW, THEREFORE, Owner and On Site agree as follows:

### ARTICLE 1

### PRE-CONSTRUCTION SERVICES AND DESIGN RESPONSIBILITIES

1.1     Pre-Construction and Design Phase:

1.1.1   On Site shall be responsible for the development of all drawings, plans, specifications and related documents (hereinafter collectively referred to as "Design Documents") required for the construction of the Vessels. The approximate size of each Vessel will be 200' by 60' by 14'. The exact dimensions will be determined and agreed to via Change Order. The preparation of the Design Documents shall be performed by qualified architects, engineers and other design professionals (hereinafter collectively referred to as "Design Professionals") The contractual obligations of the Design Professional are undertaken by On Site. The agreements between On Site and the Design Professionals, and any subsequent modifications, shall be in writing. These agreements, including any financial arrangements, shall be promptly disclosed to Owner upon request.

1.1.2   On Site shall be responsible to Owner for acts and omissions of On Site's employees, subcontractors and their agents and employees, and other persons, including the Design Professionals, performing any portion of On Site's obligations under Article 1 of the Contract.

1.1.3   Nothing contained in this Article 1 shall create a contractual relationship between Owner and any other person or entity other than On Site.

1.1.4   On Site shall coordinate the development of the Design Documents by consulting with the Owner, the Design Professionals, and the U.S. Coast Guard, as necessary, as they are being prepared. On Site will recommend alternative solutions whenever design details affect construction feasibility and costs.

1.1.5   The Design Documents shall remain the property of On Site. However, should On Site default on the Contract, On Site, and the Design Professionals shall grant Owner a license to use the drawings, plans and specifications for the completion of the Work. On Site shall pay royalties and license fees for patented designs, processes or products. On Site shall defend suits or claims of infringement of patent rights and shall hold Owner harmless from loss or account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer is required by Owner. However, if On Site has reason to believe the use of a required design, process or product is an infringement of a patent, On Site shall be responsible for such loss unless such information is promptly furnished to Owner.

### ARTICLE 2

### CONSTRUCTION

2.1   On Site shall designate a representative authorized to act on On Site's behalf with respect to the Work. Owner shall have the right to inspect and approve the Work while in progress and before accepting title to each Vessel.

2.2   On Site shall prepare and file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Work to be performed under this Contract.

2.3   Unless otherwise provided in this Contract, On Site shall provide, or cause to be provided, and shall pay for design, services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the work. On Site shall provide/perform all labor for the construction of the Vessels including but not limited to proper Outfitting, Electrical, Ventilation, Piping, Installation of Machinery and Interior Outfitting as described in the Design Documents provided by the Design Professionals and made a part hereof. On Site shall maintain in good working order all construction equipment, machinery and tools required for the performance of the Work.

2.4   On Site shall be responsible for all construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the work. On Site shall provide administrative, management and related services as required to coordinate the Work with the activities and responsibilities of the Design Professionals and the U.S. Coast Guard, as required, to complete the Work. On Site shall provide sufficient labor, organization, personnel and management to carry out the requirements of this Contract. On Site warrants to Owner that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, and that the construction will be free from faults and defects and that the construction will conform in all respects with the requirements of the Contract Documents. Construction not conforming to these requirements, including substitutions not approved by Owner in writing, shall be corrected at the expense of On Site.

2.5   On Site will recommend necessary or desirable changes to Owner, review requests for changes, submit recommendations to the Design Professionals and Owner, and if they are accepted, prepare and sign Change Orders.

Page 2 of 11

2.6    On Site shall keep Owner informed of the progress and quality of the work.

2.7    On Site shall maintain at the Work site, on a current basis: a record copy of all Contracts, Drawings, specifications, Addenda, Change Orders and other Modifications, in good order and marked to record all changes made during construction; Shop Drawings, specifications, Addenda, Change Orders and other Modifications, in good order and marked to record all changes made during construction; Shop Drawings; Product Data; Samples; submittals; purchases; materials; equipment; applicable handbooks; maintenance and operating manuals and instructions; other related documents and revisions which arise out of the contracts or Work. All of the above referenced documents shall be provided to Owner at the completion of the Contract.

2.8    On Site shall arrange for delivery, storage, protection and security for Owner-purchased materials, systems and equipment which are a part of the Work, until such items are incorporated into the Work.

2.9    On Site shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under this Contract. At the completion of the work, On Site shall remove from the site waste materials, rubbish, On Site's tools, construction equipment, machinery and surplus materials. However, with respect to all steel purchased by Owner, On Site shall collect and store all scrap and surplus steel for the benefit of Owner in containers and/or in an area designated by Owner.

2.10    On Site will assemble all dollies and equipment to begin construction of the Vessels. On Site shall design and construct for Owner permanent Launching Rails for the launching and future retrieval of the Vessels. On Site's winches, tools and equipment associated with the launching equipment, job site materials and equipment purchased will remain the property of On Site. The Launch Rails will be the property of the Owner.

2.11    Launching and testing of the Vessels is included in the cost of construction.

2.12    On Site shall deliver all documents, including manuals, record drawings and maintenance stocks to Owner.

## ARTICLE 3

### TIME OF COMMENCEMENT & COMPLETION

3.1    The Pre-Construction and Design Responsibilities to be performed under Article 1 of this Contract shall commence upon the execution of the March 23, 2005 Owner Notice to Proceed and Letter of Intent.

3.2    The Construction of the first barge under Article 2 of this Contract shall commence on or about May 1, 2005, but no later than June 1, 2005. Construction of the second barge shall commence two months thereafter and the third two months after and then the fourth, fifth and sixth every two months. Approximate construction time is four months per barge. Total work will be completed within fifteen months following commencement.

## ARTICLE 4

### CONTRACT PRICE

4.1     Owner shall pay On Site in current funds for the performance of the Work, subject to additions and deductions by executed Change Orders, the Contract Sum of (Five Million Two Hundred Ninety-Two Thousand Dollars and Zero Cents ($5,292,000.00 U. S. Dollars) (the "Contract Sum"). As set forth in paragraph 5.5, On Site shall order and Owner shall directly pay for all of the steel to be used in the construction of the Vessels. Thus, the Contract Sum shall be adjusted to reflect the amount of steel purchased by Owner as set forth in Paragraph 5.5.

## ARTICLE 5

### PAYMENT

5.1     On Site acknowledges receipt from Owner of an initial payment of One Hundred Thousand Dollars and Zero Cents ($100,000.00) pursuant the mutual execution of the March 23, 2005 Notice to Proceed and Letter of Intent.

5.2     Owner shall make an additional payment of Two Hundred Thousand Dollars and Zero Cents ($200,000.00) upon mutual execution of this Contract.

5.3     Owner shall make to On Site thirty (30) progress payments in equal installments of ($72,900.00) less a retention of ten (10) percent ($7,290.00) due on the 10th and the 25th of each month. These payments will begin two (2) weeks after the Work begins and the bulk of the steel is delivered to the Work site.

5.4     On Site warrants and agrees that, at the time each Progress Payment is made, all Work up to that point has been paid for and shall pass to the Owner free and clear from liens, claims, security interests or encumbrances in favor of On Site or any other person or entity performing the Work or furnishing materials or equipment related to the Work. At the request of the Owner, On Site shall provide waivers and lien releases in a form acceptable to Owner from all persons who may be potential lien claimants as a prerequisite to the Owner's obligation to disburse Progress Payments and final payment.

5.5     It is the intent of the parties that all of the steel for the Work will be ordered and purchased as soon as possible to secure a price at or about 55 cents per pound, or less. On Site shall arrange for the purchase of steel for the Work. Owner shall pay for the steel directly with no mark up from On Site. Payment for the steel is due when the steel arrives at 400 Hopper Street, Petaluma, California or, if the steel company requires a deposit, when ordered. On Site represents and warrants that all steel for the Work shall be ordered promptly upon the completion of the design for the Vessels and no later than 7 days after completion of the design.

On Site and Owner acknowledge that the price of steel fluctuates and understand that the final price of steel may be different than what On Site and Owner agree to here. If the cost of the steel required for the Work increases and that increase is charged to On Site by the steel supplier, Owner agrees to execute a Change Order increasing the Contract Sum to reflect the increase in the cost of

steel only and with no mark-up to On Site. However, if the price of steel increases at any time to 65 cents per pound, Owner has the absolute right to terminate this Contract. If the cost of the steel required for the Work decreases and the decrease in price of steel results in a saving, discount, or credit to On Site by the steel supplier, On Site agrees that the entire savings, discount or credit will be passed on to Owner and that On Site will execute a Change Order decreasing the Contract Sum to reflect the decrease in the cost of steel.

5.6    Final Payment and Release of Liens:    On Site and Owner agree that upon "substantial completion," Owner will agree to accept each Vessel for use. As used herein, "substantial completion" or "substantially completed" shall mean each Vessel has been constructed and approved for its intended use by Owner and all governmental entities having jurisdiction over the design and construction of each Vessel including but not limited the U.S. Coast Guard. On Site will then release any and all claims to the Vessel and sign over the Vessel title applications to Owner. This will be done as each Vessel is completed. Upon the completion of the sixth and final Vessel, On Site will submit to Owner a complete release of all liens arising out of this Contract covering all labor, materials or equipment for which a lien could be filed. If any lien or claim remains unsatisfied after all payments are made, On Site shall defend such claims and/or liens and indemnify Owner for all moneys it may be compelled to pay in discharging such claims and/or liens, including all cost and reasonable attorney fees.

Thirty (30) days after substantial completion of the sixth and final Vessel, Owner shall pay On Site the retention, less the reasonable cost to correct or complete incorrect or incomplete Work. Final payment of such withheld sum shall be made within 30 days of the correction or completion of such Work by On Site.

The making of final payment shall constitute a waiver of all claims by the Owner except those arising from (1) unsettled liens, (2) faulty or defective Work appearing after substantial completion, (3) failure of the Work to comply with the requirements of the Contract Documents or (4) terms of any special warranties required by the Contract Documents. The acceptance of final payment shall constitute a waiver of all claims by On Site.

## ARTICLE 6

### CONTRACT DOCUMENTS

6.1    The Contract Documents constitute the entire agreement between Owner and On Site. The Contract Documents consist of this Contract and the Design Documents. The Contract Documents supersede any prior negotiations, representations or agreements, either written or oral. The Contract Documents may be amended only by written instrument and signed by both Owner and On Site.

6.2    Nothing contained in the Contract Documents shall create any contractual relationship between the Owner, the Design Professionals, and/or any sub-contractor of On Site.

6.3    The site for construction of the Vessels has been inspected, approved, accepted by Michael Dismer, President of On Site Marine Shipyards, LLC.

Page 5 of 11

## ARTICLE 7

### OWNER

7.1    The Owner shall furnish Sand Blasting Sand for the Work.

7.2    The Owner will furnish Paint and Primer for the Work.

## ARTICLE 8

### ADDITIONAL DUTIES OF ON SITE

8.1    On Site shall secure and pay for any and all permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the work which are either customarily secured after execution of a contract for construction, or are legally required at the time this Contract was executed.    On Site shall be responsible for the payroll accounting of its employees, and the proper withholding of all state and federal taxes, including FICA payments, and the payment of all workers' compensation and other employee related insurance premiums.

8.2    On Site shall, at all times, enforce strict discipline and good order among its employees and shall not employ on the Work any unfit person or anyone not skilled in the task assigned to them. On Site shall employ sufficient personal at the site to timely complete the Work.

8.3    On Site shall give all notices and comply with all laws, ordinances, rules, regulations, and lawful orders of any public authority bearing on the performance of the Work, and shall promptly notify the Design Professionals and Owner if the plans, drawings and specifications are at variance therewith.

8.4    On Site shall be responsible to the Owner for the acts and omissions of its employees, Design Professionals, sub-contractors and their agents and employees, and other persons performing any of the Work under any agreement with On Site.

## ARTICLE 9

### WORK BY OWNER OR SEPARATE CONTRACTORS

9.1    The Owner reserves the right to perform work related to the Work with its own forces, and to award separate contracts in connection with other portions of the Work without impacting On Site's contract with the Owner.

9.2    The Owner shall allow On Site and its sub-contractors reasonable opportunity for the introduction and storage of their materials and equipment and the execution of their Work, and shall coordinate its Work and theirs as required by the Contract Documents.

## ARTICLE 10

### TIME

10.1    All Time limits stated in the Contract Documents are of the essence of this Contract. On Site shall expedite the Work and achieve Substantial Completion within the specified time.

10.2    If On Site is delayed at any time in the progress of the Work by changes ordered in the Work, by labor disputes, fire, unusual delays in transportation, adverse weather conditions not reasonably anticipatable, unavoidable casualties, or any causes beyond On Site's control, or by any other cause which On Site and Owner determine may justify the delay, then the Contract Time shall be extended by Change Order for such reasonable time as the parties may determine.

## ARTICLE 11

### PROTECTION OF PERSONS & PROPERTY

11.1    On Site shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work. It shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to (1) all employees on the Work or other persons who may be affected thereby, (2) all the Work and equipment and materials to be incorporated therein, and (3) other property at the Work site or adjacent thereto. On Site shall give all notices and comply with all applicable authority bearing on the safety of persons and property and their protection from damage, injury or loss. On Site shall promptly remedy all damage or loss to any property caused in whole or in part by On Site, any Sub-Contractor, or any one directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, except damage or loss attributable to the acts or omissions of Owner or anyone directly or indirectly employed by either of them or by anyone for whose acts either of them may be liable.

## ARTICLE 12

### INSURANCE and INDEMNITY

12.1    At all times during the term of this Contract, On Site shall maintain the following insurance coverage with minimum coverages, limits and policy provisions as set forth in Attachment "A":

12.2    Unless otherwise provided, On Site shall purchase and maintain property insurance upon the entire Work at the site to the full insurable value thereof. This insurance shall include the interest of the Owner, On Site, its Sub-Contractors and other Contractors in the Work and shall insure against the perils of fire and extended coverage and shall include "All Risk" insurance for physical loss or damage including, without duplication, coverage, theft, vandalism, and malicious mischief.

12.3    Any loss insured under Paragraph 12.2 is to be adjusted with Owner and made payable to Owner as trustee for the insured, as their interest may appear, subject to the requirements of any mortgagee clause.

12.4    Indemnity: On Site shall defend, indemnify, and hold harmless Owner, including its assignees, designees, officers, agents, employees, affiliates, parents and subsidiaries, and each of them, from and against any and all claims, debts, demands, damages (including direct, liquidated, or other damages), judgments, awards, losses, liabilities, interest, attorneys' fees, costs, and expenses,

Page 7 of 11

of whatsoever kind or nature, arising out of or in any way connected with On Site's operations to be performed under this Contract including but not limited to:

a. Claims for personal injury, including, but not limited to, bodily injury, emotional injury, sickness or disease, or death to persons, including, but not limited to, any employees or agents of On Site or Owner, and/or damage to property of anyone (including loss of use thereof), caused or alleged to be caused in whole or in part by any act or omission of On Site or anyone directly or indirectly employed by On Site or anyone for whose acts On Site may be liable regardless of whether such personal injury or damage is caused by a party indemnified hereunder.

b. Penalties imposed because the violation of any law, safety order, order, citation, rule, regulation, standard, ordinance or statute, caused by the action or inaction of On Site.

The indemnification provisions of (a) and (b) above shall extend to Claims occurring after this Contract is terminated as well as while it is in force. Such indemnity provisions apply regardless of any active and/or passive negligent act or omission of Owner. However, On Site shall not be obligated under this Contract to indemnify Owner for claims or damages arising out of the sole negligence or willful misconduct of Owner.

In the event that Owner shall become involved in any litigation, arbitration or other controversy arising out of On Site's operations pursuant to this Contract, On Site agrees to pay all reasonable expenses, including attorney fees, expert fees and costs incurred by Owner in enforcing the Insurance and Indemnity provisions set forth in Article 12 of this Contract or defending against third-party claims.

## ARTICLE 13

## CHANGES IN THE WORK

13.1 Owner, without invalidating the Contract, may order changes in the Work consisting of additions, deletions, or modifications, the Contract Sum and Contract Time being adjusted accordingly. All such changes in the Work shall be authorized by written Change Order signed by the Owner and On Site.

13.2 The Contract Sum and the Contract Time may be changed only by Change Order.

13.3 Except as provided in Article 5, Paragraph 5.5, the cost or credit to the Owner from a change in the Work shall be determined by mutual agreement.

## ARTICLE 14

## WARRANTY AND CORRECTION OF WORK

14.1 On Site warrants that all Work performed will be of good quality, free from faults and defects and in conformance with the Contract Documents. All such Work not conforming to these requirements, including substitutions not approved and authorized by Owner in writing, may be considered defective. On Site shall promptly correct any Work rejected by Owner as defective or as failing to conform to the Contract Documents whether observed before or after Substantial

Completion and whether or not fabricated, installed or completed, and shall correct any Work found to be defective or nonconforming within a period of ten (10) years from the date of Substantial Completion of the sixth and final Vessel. The provisions of this Article 14.1 apply to Work done by On Site subcontractors as well as to Work done by direct employees of On Site.

## ARTICLE 15

### TERMINATION OF THE CONTRACT

15.1    If Owner fails to make payment hereon for a period of five (5) days following the date each Progress Payment is due, through no fault of On Site, and if Owner fails to cure its lack of payment, On Site may upon seven (7) additional days written notice to the Owner, terminate the Contract and recover from Owner payment for all work executed and for any proven loss sustained as a result of the purchase of any materials, equipment, tools, and construction equipment and machinery, including reasonable profit and damages applicable to the Work.

15.2    If On Site defaults or consistently fails or neglects to carry out the Work in accordance with the Contract Documents, Owner, after seven (7) days written notice to On Site and without prejudice to any other remedy it may have, may make good such deficiencies and may deduct the cost thereof, including compensation for any design professionals' additional services made necessary thereby from the payment then or thereafter due On Site or, at its option, may terminate the Contract.

## ARTICLE 16

### DISPUTE RESOLUTION

16.1    Claims, disputes or other matters in question between the parties to this Contract arising out of or relating to this Contract or breach thereof shall be subject to and decided by mediation or arbitration. Such mediation or arbitration shall be conducted in accordance with the mediation or arbitration rules of the American Arbitration Association currently in effect.

In the event of any claim, dispute or other matter in question between the parties, On Site agrees to continue to perform the Work diligently to completion and will neither rescind the Contract nor stop the progress of the Work, but will submit such controversy to mediation and/or arbitration as provided in Article 16 after the Work has been completed.

16.2    In addition to and prior to arbitration, the parties shall endeavor to settle disputes by mediation. Demand for mediation shall be filed in writing with the other party to this Contract and the American Arbitration Association. A demand for mediation shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for mediation be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations. Once one party files a request for mediation with the other party and the American Arbitration Association, the parties agree to conclude such mediation within (60) sixty days of filing the request. Failure to conclude the mediation within 60 days shall waive the right to mediation, unless agreed otherwise in writing.

16.3    Demand for arbitration shall be filed in writing with the other party to this contract and with the American Arbitration Association. A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statutes of repose or limitations.

16.4    Venue for mediation and/or arbitration shall be Sonoma County, California. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law and any court having jurisdiction thereof.

16.5    Except as otherwise provided in this Contract, On Site and Owner agree that each party shall bear their own attorneys' fees, costs, expert costs in relation to any mediation and/or arbitration, and shall share equally in the cost of the mediation and/or arbitration.

## ARTICLE 17

### MISCELLANEOUS PROVISIONS

17.1    This Contract shall be governed by the laws of the State the California.

17.2    Joint Preparation: On Site and Owner each participated in the preparation of this Contract, and the Parties agree that the Contract and its terms shall not be construed in favor or against one or the other.

17.3    Severability: The partial or complete invalidity of any one or more provisions of this contract shall not affect the validity or continuing force and affect of any other provision.

17.4    Assignment: Neither the Owner nor On Site shall assign its interest in this Contract without the written consent of the other except to the assignment of proceeds. The terms and conditions of this Contract shall be binding upon both parties, their partners, successors, assigns and legal representatives. Neither party to this Contract shall assign the contract as a whole without written consent of the other except that the Owner may assign the contract to any other corporation, partnership, proprietorship, or joint venture in which the Owner has a majority interest or the shareholders of Owner have a majority interest. In the event of such assignment, On Site shall execute all consents reasonably required. In such event, the assignee shall assume the Owner's rights and obligations under the contract documents. If either party attempts to make such an assignment, that party shall nevertheless remain legally responsible for all obligations under the Contract, unless otherwise agreed by the other party.

17.5    No Waiver of Performance: The failure of either party to insist, in any one or more instances, on the performance of any terms, covenants or conditions of this contract, or to exercise any of its rights, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right with respect to further performance.

17.6    Notices: Any notice, request, demand or other communication required or permitted to be given hereunder shall be in writing, may be personally served, faxed or sent by a nationally

recognized overnight delivery or courier service.  Any fax transmittal must be sent during business hours on a week day.  Notice shall be deemed to have been given when delivered in person or by courier or overnight service or upon successful transmission of a fax, addressed to the recipients as follows:

|  |  |
|---|---|
| **Owner:** | Corto Meno Sand and Gravel, LLC<br>181 Lynch Creek Way<br>Petaluma, CA 94954<br>Attention: Robert S. Bowen |
|  | Phone: (707) 781-9000<br>Fax:    (707) 781-9055 |
| **On Site:** | On Site Marine Shipyards, LLC<br>2229 West Village Lane<br>Springfield, MO 65807<br>Attention: Michael Dismer, President |
|  | Cell Phone: (417) 425-0655 |

Any party may change its address by giving notice thereof to the other parties in accordance with this section.

17.7    Execution in Counterparts:  This Contract may be executed in one document signed by all Parties, or in counterparts, some or all of which may be transmitted by facsimile or electronically and each of which will be deemed an original.  If executed in separate counterparts, all such counterparts shall constitute but one and the same document which may be sufficiently evidenced by one counterpart signed by the party who is to be charged with it.

This Contract entered into as of the day and year first above written.

Dated: _16, April_, 2005    On Site Marine Shipyards, LLC

By: _Mall A. Dista_
Name: _Michael D. Dismer_
Title: _President_

Dated: _15 April_, 2005    Corto Meno Sand & Gravel, LLC

By: _____
Name: _Eugene B. Cecca Hi_
Title: _Managing Member_

Page 11 of 11

# INSURANCE REQUIREMENTS
## ATTACHMENT A

- **Commercial Automobile Liability Insurance:**

    The following minimum limits of coverage are required:
    $1,000,000    Liability Combined Single Limit
                        Bodily Injury and/or Property Damage – Each Accident
    **Waiver of Subrogation required.**

- **Automobile Physical Damage Coverage:**

    **If you have care, custody, or control of Owner's and/or an affiliated company's equipment this equipment must be insured by you** from loss by Comprehensive or Fire, Theft, and Specified Perils, plus Collision. The limits of coverage shall be the Actual Cash Value of the equipment, as of the date of loss.
    Additional Insured shall also be the Loss Payee.

- **Commercial General Liability:**

    Occurrence Form only.  Waiver of Subrogation required.
    The following minimum limits of coverage are required.
    $1,000,000    General Aggregate
    $1,000,000    Products-Completed Operations Aggregate
    $1,000,000    Personal and Advertising Injury Limit
    $1,000,000    Each Occurrence
    $    50,000    Fire Legal Liability-Each Fire
    $     5,000    Medical Payments-Each Person

- **Workers' Compensation and Employer's Liability:**

    Coverage A:    California Statutory Benefits.
    Coverage B:    $1,000,000    Per Employee-Bodily Injury-Each Accident
                        $1,000,000    Per Employee-Bodily Injury-By Disease
                        $1,000,000    Per Employee-Bodily Injury-By Disease Policy Limit
    **Waiver of Subrogation required. U.S. Longshoreman & Harbor Workers (USL&H) endorsement is required for this project.**

- **Umbrella/Excess Liability Insurance**

    **Required limits:**
    $5,000,000 Each Occurrence
    $5,000,000 Aggregate

**EXHIBIT B**

- **OTHER CONDITIONS THAT ARE REQUIRED INCLUDE THAT:**

All Certificates of Insurance are to evidence, as respects Automobile Liability, Physical Damage and Commercial General Liability that all coverage's are **Primary, and not contributory** to any insurance maintained by Corto Meno Sand & Gravel, LLC.

The following Additional Insured wording is to be made a part of the Certificate by endorsement to your policy(ies):

"The Additional Insured(s) covered under the above policy(ies) are as follows:

Corto Meno Sand & Gravel, LLC and any other corporation, partnership, proprietorship or joint venture in which Corto Meno Sand & Gravel, LLC has a majority interest or the shareholders of Corto Meno Sand & Gravel, LLC have a majority interest."

A waiver of subrogation in favor of the Certificate Holder /Additional Insureds

All certificates shall have the language "endeavor to" and "but failure to…representatives…" deleted in their entirety.

Cancellation or material change will require no less than thirty- (30) days written notice to Additional Insured and Loss Payees.

The description of operations section of the Certificate shall reflect

"All operations, projects or activities conducted by the Insured on behalf of the Additional Insureds."

Any and all deductibles shall be the responsibility of On Site.

Not contain any "cross-suite exclusion" or any type of exclusion which purports to exclude insurance coverage from claims brought by one named insured against another named insured.

Not have a self-insured retention in excess of $25,000.00.

**EXHIBIT C**

## ASSIGNMENT CONTRACT

For value received, CORTO MENO SAND & GRAVEL, LLC (herein "Assignor") hereby assigns all its right, title, and interest in and to the contract entered into by and between Assignor and On Sight Marine Shipyards, LLC ("On Sight") to that certain contract dated April 15, 2005 ("Contract"), to Landing Way Depot Inc. ("Assignee").

The subject matter of the contract is the hiring of On-Sight to design and provide the necessary labor and materials for construction of six (6) vessels at 400 Hopper Street, Petaluma, California (hereinafter "The Work").

A copy of the contract, as described above, is attached to this assignment and incorporated herein by this reference. By this assignment, Assignor delegates to Assignee all of Assignors duties and obligations of performance of the contract. By accepting this assignment, Assignee agrees to assume and perform all duties and obligations that Assignor has under the contract, as if Assignee had been the original party to the contract. Assignee further agrees to indemnify and hold Assignor harmless for any liability performance or non-performance of the contract.

1.    Time is of the essence of this assignment.

2.    The assignment and each of the provisions shall be binding on and inure to the benefit of all the parties hereto, their shareholders and their respective assignees and successors in interest.

3.    This assignment may be amended only by a writing signed by the party against whom or against whose successors or assigns enforcement of the charges sought.

4.    If any term, provision, or application of this assignment is held invalid or unenforceable, the remainder of this assignment and any application of the terms or provisions shall not be effected thereby, but shall remain valid and enforceable.

5.    This assignment shall be governed by and construed in accordance with the laws of the State of California.

Executed at Petaluma, California, on _____ June 1 _____, 2005.

Assignor:  Corto Meno Sand & Gravel, LLC        By _____

Assignee:  Landing Way Depot, Inc.              By _____

## RECEIPT AND CONSENT OF ASSIGNMENT

The undersigned, On Site Marine Shipyards, LLC (herein "On Site") hereby acknowledges and agrees to the following:

### RECITALS

A.    On April 15, 2005, On Site did enter into a design and fabrication agreement for six (6) vessels (herein the "Contract") with Corto Meno Sand & Gravel, LLC (herein "Assignor").

B.    On June 1, 2005, Assignor did assign its entire right, title, interest and obligations under the contract to Assignee (herein the "Assignment", a copy of which is attached hereto and incorporated herein). The assignment from Assignor to Assignee was known and verbally acknowledged to by On Site; however, the parties failed to memorialize said assignment in writing.

C.    The parties' desire by this agreement to acknowledge the foregoing described assignment in writing.

Now, therefore, the undersigned On Site acknowledges receipt of the copy of the foregoing Assignment and Notice of Assignment, executed on June 1, 2005, and hereby consents to the same.

Executed at Petaluma, California, on September 29, 2006.

Assignor:  Corto Meno Sand & Gravel, LLC        By _____
                                                                                  Robert S. Bowen

On Site Marine Shipyards, LLC                          By _____
                                                                                  Michael Dismer, President